308 Ga. 321
FINAL COPY

S20A0214.  CORLEY v. THE STATE.

BLACKWELL, Justice.

Vivian Waldon Corley was tried by a Chatham County jury and convicted of murder, aggravated assault, and the unlawful possession of a firearm during the commission of a felony in connection with the fatal shooting of Lorraine Manuel. Corley appeals, claiming that the evidence is insufficient to support her convictions, that she previously had been acquitted of murder with malice aforethought and could not be retried for that crime, that the trial court erred when it excluded certain evidence, and that the prosecuting attorney made improper comments to the jury. Upon our review of the record and briefs, we see no reversible error related to these claims. We do note, however, that the trial court erred when it failed to merge the aggravated assault into the murder. We therefore vacate the conviction and sentence for aggravated assault,

and we otherwise affirm.[1]

1. Viewed in the light most favorable to the verdict, the record shows that Manuel and her fiancé, Marshall Franklin, completed an application in June 2015 to rent Corley's house in Chatham County. A few days later, the couple decided not to rent the house, and Franklin told Corley that they wanted her to return their rental application (which included personal information, including Manuel's social security number). Corley was not receptive to this request, and she told Franklin that she would call the police if he came to the house.

---

[1] Manuel was killed in June 2015. A Chatham County grand jury indicted Corley in November 2015, charging her with murder with malice aforethought, murder in the commission of a felony, aggravated assault, and the unlawful possession of a firearm during the commission of a felony. After her first trial ended in a hung jury, Corley was retried in March 2018, and the jury found her guilty on all counts. The trial court sentenced Corley to imprisonment for life for malice murder, a concurrent term of imprisonment for twenty years for aggravated assault, and a consecutive term of imprisonment for five years for the unlawful possession of a firearm during the commission of a felony. The felony murder was vacated by operation of law. Corley timely filed a motion for new trial, which she twice amended in September 2018, and the trial court denied that motion in June 2019. Corley then timely filed a notice of appeal. The case was docketed in this Court for the term beginning in December 2019 and submitted for decision on the briefs.

Manuel was determined to retrieve the rental application, however, and she set off for Corley's house. Corley was apparently aware that either Manuel or Franklin was coming, and she (twice) called 911 to report that Franklin had threatened her; although when the dispatcher asked how he had threatened her, Corley acknowledged that she couldn't understand what he had said but thought he said something about having a "piece," and Corley repeatedly declined the dispatcher's offer to send a patrol officer to the house.[2] When Corley saw Manuel approaching her house, she told some potential renters who were looking at the house that they needed to leave. Meanwhile, Manuel called Franklin, asking him "to stay on the phone with her to make sure everything goes smooth[ly]."

Through Manuel's phone, Franklin heard Manuel knock on Corley's door, and he heard them argue about the application (with

---

[2] Corley also told the 911 dispatcher that Franklin was threatening "to sue [her] but he didn't complete his application," that he was trying to "make [her] let him move in [her] house," and that he had asked "a whole lot of questions that didn't make sense."

Manuel ultimately demanding that Corley return the application "right now"). Corley then fatally shot Manuel in the head with a .38-caliber revolver. Corley called 911 and admitted that she had shot Manuel, but when the dispatcher asked what had happened, Corley evaded the question. And even though Manuel was lying on her back with a single gunshot wound to the head that was bleeding profusely, Corley told the dispatcher that she thought the shot was to Manuel's chest, and she claimed that she "tried to shoot [Manuel] in the leg."[3] When police officers arrived, Corley reported that Manuel — who was unarmed — had tried to attack her, but Corley had not sustained any injuries.

(a) Corley asserts that the State failed to prove beyond a reasonable doubt that she was not justified in shooting Manuel. But questions about the existence of justification are for a jury to decide, see Crayton v. State, 298 Ga. 792, 793 (1) (784 SE2d 343) (2016), and

---

[3] Corley also initially told the dispatcher that she did not know if she knew the victim, and — despite being a registered nurse — Corley resisted efforts suggested by the dispatcher to provide first aid to Manuel (who can be heard moaning on the 911 recording).

the verdict in this case is supported by the evidence. The jury was able to consider Corley's credibility through the recording of her 911 calls and her statements to the police immediately after the shooting, and the jury was authorized to conclude that she did not reasonably believe that it was necessary to shoot Manuel in order to defend herself or her home. See <u>Anthony v. State</u>, 298 Ga. 827, 829 (1) (785 SE2d 277) (2016) ("The jury is free to reject any evidence in support of a justification defense and to accept the evidence that the shooting was not done in self-defense.").

(b) Although the jury was authorized by the evidence to find Corley guilty of both murder and aggravated assault, the trial court could enter a judgment of conviction and impose sentence for only one of those offenses. As charged in the indictment, the murder and aggravated assault both were based on the single gunshot that struck Manuel in the head. The trial court should have merged those crimes, and because it did not, we vacate the conviction and sentence for aggravated assault. See <u>Reddings v. State</u>, 292 Ga. 364, 367 (2) (738 SE2d 49) (2013).

2. Corley's first trial ended with a mistrial after the jury was unable to reach a verdict. Corley, however, maintains that the first jury did, in fact, reach a verdict of not guilty as to the count charging her with malice murder and that she could not, therefore, be tried again for that offense. But Corley's contention that the first jury returned a not guilty verdict is belied by the record.

The transcript of Corley's first trial shows that the jury began its deliberations on a Friday afternoon. Deliberations continued on the following Monday, but one of the jurors was then replaced with the alternate, and deliberations began anew around 11:15 on Monday morning. Around 4:30 that afternoon, the trial court received a note from the foreperson stating that the jury was "having an impossible time coming to a unanimous decision" and asking if the court would "consider the jury hung." Neither the trial court, Corley, nor the prosecuting attorney thought that it would be appropriate to conclude deliberations at that point. Instead, the prosecuting attorney asked if the court would give an <u>Allen</u> charge.[4]

---

[4] See <u>Allen v. United States</u>, 164 U. S. 492 (17 SCt 154, 41 LE 528) (1896).

The judge said that such a charge would be premature, that he would inform the jury that it should continue to deliberate, and that the court would consider giving an <u>Allen</u> charge the next day. No objection to that approach was raised. The court brought in the jurors, reminded them that they had only been deliberating for a few hours (because their deliberation on Friday "really isn't counted"), and informed them that it would not "consider the jury hung" until they had continued deliberating for some additional amount of time.

At Corley's request, the court asked the foreperson to write down the jury's current split as to each count (but to just include the numbers and not to denote how "many for guilty or . . . not guilty"). The foreperson reported that he already had such a list, and he provided the list to the court. That list (which is now mischaracterized by Corley as a "verdict form") showed a count of 12 "NG" votes as to malice murder and split votes on the other counts. The trial court noted that the list provided more information than it wanted to know, but that "[a]gain, you haven't really been deliberating nearly long enough for this to be considered a hung

jury." The jury never gave any indication that the list it provided to the judge was intended to be a verdict, nor did the jury maintain that it had concluded its deliberations as to any count. Instead, the jury continued deliberating, and when the jury reported — three days later — that it was hopelessly deadlocked (resulting in the trial court declaring a mistrial), it was split as to all of the charges, including malice murder. Contrary to Corley's assertions, the first jury never reached a verdict on any count, the trial court properly declared a mistrial, and Corley's claim that she could not be retried for malice murder is without merit. See State v. Lane, 218 Ga. App. 126, 127 (460 SE2d 550) (1995) ("the trial court was incorrect in ruling that the jury '(arrived) at a not guilty verdict for murder'" where the jury merely had "*handed notes* to the trial court" (emphasis in original)). Cf. Byrd v. State, 277 Ga. 554, 557-558 (3) (592 SE2d 421) (2004) (trial court did not err when it accepted a partial verdict of guilty on several counts where jury announced "that it had reached a verdict" on those counts (but "was not unanimous" on the remaining count) and trial court allowed the jury

to continue to deliberate on all counts before accepting the partial verdict and declaring a mistrial as to the remaining count).

3. Corley contends that the trial court erred when it excluded extrinsic evidence to impeach Franklin's testimony about a rent dispute that he and Manuel had with a prior landlord. During her cross-examination of Franklin, Corley asked if he and Manuel had ever been served with an eviction notice. Franklin responded that they had not, and Corley was permitted to cross-examine Franklin about a rent dispute with a prior landlord that allegedly resulted in an eviction. Corley was also permitted to present Franklin with court papers to refresh his recollection about the dispute. And after Franklin testified that he did not remember going to court over the dispute and that he and Manuel moved out of the property at issue before any eviction, Corley sought to present extrinsic evidence to impeach Franklin's testimony.[5] But the trial court excluded the

---

[5] The proposed evidence consisted of magistrate court documents related to the prior dispute as well as the testimony of the property manager who represented the landlord in the dispute.

evidence after concluding that the issue of the prior dispute was not "germane or material" to the relevant issues at trial (primarily, whether Corley was justified in shooting Manuel).[6] Corley now alleges that the trial court abused its discretion when it excluded this impeachment evidence. See <u>Flannigan v. State</u>, 305 Ga. 57, 62 (3) (823 SE2d 743) (2019) ("The admission of evidence lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent a clear abuse of discretion." (Citation and punctuation omitted)).

OCGA § 24-6-621 provides that "[a] witness may be impeached by disproving the facts testified to by the witness," but the use of extrinsic evidence to impeach a witness by contradiction is not unlimited. The language in OCGA § 24-6-621 is substantively identical to former OCGA § 24-9-82 (which provided that "[a] witness may be impeached by disproving the facts testified to by

---

[6] We note that Corley did not propose to introduce the evidence of the prior rent dispute as character evidence or to impeach Franklin on general credibility grounds. Instead, she sought to introduce it solely to contradict Franklin's testimony about the prior rent dispute.

him"). And although former OCGA § 24-9-82 (like OCGA § 24-6-621) did not include any express limitations on the ability to impeach a witness, it was well settled under our old Evidence Code that impeachment by contradiction was limited in regard to matters that are collateral to the material issues at trial. See <u>Brown v. State</u>, 260 Ga. 153, 156 (4) (391 SE2d 108) (1990).

As we have repeatedly noted, "we are all living in a new evidence world" that requires analysis of the new law, not blind reliance on the cases decided under the old law. See <u>Davis v. State</u>, 299 Ga. 180, 192 (3) (787 SE2d 221) (2016). Nevertheless, there *are* limited situations where it *may* be appropriate to rely upon cases decided under the old Evidence Code. Such cases may be relevant where, as here, our new rule was "carried over from our old Evidence Code" and has no counterpart in the Federal Rules of Evidence. <u>State v. Frost</u>, 297 Ga. 296, 299 (773 SE2d 700) (2015). Even so, the applicability of the old cases is also limited by other newly adopted provisions of the current Evidence Code. Primarily, OCGA §§ 24-4-401, 24-4-402, and 24-4-403 "overlay the entire Evidence Code, and

are generally applicable to all evidence that a party seeks to present." Chrysler Group v. Walden, 303 Ga. 358, 362 (II) (A) (812 SE2d 244) (2018). In addition, we have previously noted that OCGA § 24-6-621 also may "be read in conjunction with OCGA §§ 24-6-607 and/or 24-6-613 (b), as well as their federal counterparts." Taylor v. State, 302 Ga. 176, 180 (3) n.5 (805 SE2d 851) (2017) (citing Ronald L. Carlson, Carlson on Evidence, 351-352 (5th ed. 2016)). And we have already held that impeachment with a prior inconsistent statement under OCGA § 24-6-613 (b) does not allow the introduction of extrinsic evidence related to issues that "are collateral to the subject matter of the case." Hood v. State, 299 Ga. 95, 99 (2) (786 SE2d 648) (2016) (citation and punctuation omitted). Similarly, it is within a trial court's discretion to determine if a party is improperly attempting to use extrinsic evidence to impeach a witness by contradiction under OCGA § 24-6-621 on a matter collateral to the relevant issues at trial. And the trial court in this case did not abuse its discretion when it excluded the extrinsic

evidence at issue.[7]

4. At trial, Corley sought to introduce the testimony of two of her neighbors about conversations that she had with them prior to the shooting. The trial court allowed the first neighbor to testify that, about an hour before the shooting, Corley came to his house and told him to "watch out because somebody or that guy was going to come [to her house]" and to call 911 if he "heard screaming." Corley sought to introduce testimony from a second neighbor that Corley had made similar comments to him, but the trial court excluded that evidence. Corley claims that this was error, but the record shows that there was an abundance of evidence that Corley was interested in contacting law enforcement prior to the shooting. In fact, the best evidence of this was the recording of the 911 calls that Corley actually made — just prior to the shooting — to report

---

[7] Corley argues that the evidence about the prior rent dispute *was* sufficiently related to her case because Manuel and Franklin had represented in their rental application with Corley that they had never been evicted. But Manuel's killing had nothing to do with a rent dispute with Corley (or anyone else), nor does it seem plausible that Corley's justification defense could have any relation to an alleged misrepresentation that may have appeared on the rental application.

that she was being "threatened" and "harassed" by Franklin and thought he said something about having a "piece." Because the jury heard these recordings, it was well aware that Corley was interested in contacting law enforcement just prior to the shooting, and the testimony of a second neighbor about this interest would have had little probative value and would have been needlessly cumulative. See OCGA § 24-4-403. As a result, the trial court did not abuse its discretion when it excluded the testimony of the second neighbor about Corley's interest in contacting law enforcement.

5. Finally, Corley contends that the prosecuting attorney made improper comments to the jury that deprived her of a fair trial.[8] But Corley did not object to these comments at trial, so this enumeration

---

[8] Both in her brief and in her motion for new trial (as amended), the only "comment[ ]" that Corley mentions is a question posed to a police officer about having the "unfortunate task[ ] of . . . having to tell these nice folks that their daughter died." Corley identifies the other comments only by their page number in the transcript. As best we can tell, her complaints on appeal seem to be about statements during the State's closing argument that prosecuting attorneys called "the best" police officers to testify, that "[w]e're not making this up" in reference to evidence that Corley had offered to lower the amount of rent she would charge Manuel and Franklin (based on some improvements that they had made and that they offered to make to Corley's house), and a statement that "[e]ither you believe [Franklin], and I think you should, or you don't."

of error is not properly before our Court for review. See <u>Grier v. State</u>, 305 Ga. 882, 887 (3) (828 SE2d 304) (2019) ("The contemporaneous objection rule cannot be avoided by characterizing trial occurrences as examples of prosecutorial misconduct.") (Citation and punctuation omitted.).

<u>Judgment affirmed in part and vacated in part. Melton, C. J., Nahmias, P. J., and Boggs, Peterson, Warren, Bethel, and Ellington, JJ., concur.</u>

DECIDED MARCH 13, 2020 — Reconsideration denied June 29, 2020.
    Murder. Chatham Superior Court. Before Judge Morse.
    *Teri L. Thompson*, for appellant.
    *Meg E. Heap, District Attorney, Emily C. Puhala, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.